BITCO General Insurance Corporation v. Union Ridge Ranch, LLC 24-6473 and 24-6474 24-6474 Good morning, Your Honors. May it please the Court, Mike Vial, VF Law for the Appellant, Union Ridge Ranch. I'll reserve two minutes. I know Your Honors read the briefs and reviewed the experts' records, so I just want to focus on a handful of the District Court's most significant errors. Okay. The Court should have granted summary judgment to Inland because the impaired property exclusion is wholly inapplicable under Washington's efficient proximate cause rule. Can I interrupt you right at the top because I'm distracted by you just said that summary judgment was warranted, but there's a footnote in the judge's order that talks about on the indemnification issue that both parties, Bidco included, its footnote, well now my little, excuse me, my annotation went right over the footnote. You're right. It's footnote 3 that indicates that the parties agreed that a ruling would be on indemnification would be premature. I don't think that's correct, Your Honor. Both parties moved for summary judgment. Well, for partial summary judgment, right? So back in the District Court, what was Bidco's moving for summary judgment on what? On the issue of whether it had a duty to indemnify Inland. Inland was moving for summary judgment on the issue of whether Bidco had a duty to indemnify Inland. Well, that's what one would think from the briefing, but this footnote, is it your contention then this footnote was just in error? I believe so, Your Honor, without looking at it. Okay. So I don't, I won't belabor the point. It says Bidco also argues that the determination of the duty to indemnify is premature. Yes. I'm sorry, Your Honor. Bidco did make that argument in their briefing, but then proceeded to argue why summary judgment in Bidco's favor on the issue of indemnity was appropriate. Okay. So was that maybe just limited to not having the final judgment? Yes. That was the issue, Your Honor. Okay. I've interrupted you. Please go right ahead. No problem. So the Court should have granted summary judgment to Inland on the issue of indemnity because this impaired property exclusion is completely inapplicable under Washington law due to the efficient proximate cause rule. So in the Safeco v. Hitchman case, the Washington Supreme Court held that if the initial event, the efficient proximate cause, is a covered peril, then there's coverage under the policy regardless of whether subsequent events or subsequent damages, which may in fact, which may be the cause in fact of the ultimate harm that the plaintiff suffered, even if those are excluded under some provision of the policy, coverage still applies if the efficient proximate cause is a covered peril. So here, the Bidco policy indemnifies Inland against property damage caused by Inland's negligence. So any such damage is going to be a covered peril unless it's excluded under some provision of the policy. Right. So he assumed basically, he essentially assumed coverage and went right on to the exclusion, right? Or isn't that what, why wouldn't we do that? That's the... I think so, Your Honor, but he assumed coverage based on the wrong peril. So the peril for the Court assumed coverage was the failure of Wall Number 4, where Wall Number 4 was in place for several months, and then it suddenly cracked, showed signs of displacement, bulging, et cetera. Right. So what is the provision you think he should have relied on? Coverage based on what peril? The covered peril was the event that caused Wall Number 4 to fail. So that peril was the ponding and the saturation of the soils behind Wall Number 4, which was due to Inland's negligent grading. So... But it's still Inland's negligent work, so how does that help you? Because you have covered property damage due to the saturation ponding that is not subject to any exclusion. The resulting damage there would be the failure of Wall Number 4, which in turn caused the loss of use of the entire project. So the loss of use of the entire project could theoretically be subject to the impaired property exclusion, because it's property that's no longer able to be used for its intended purpose, it's less useful, et cetera, and the exclusion would apply unless there was a sudden and accidental physical injury to tangible property. But we don't get there if you have property damage that is a covered peril that stands on its own. So you're not getting to the exception? You don't even have to get to the exclusion in the first place, because the only reason that we're even talking about this potential exclusion, this impaired property exclusion, is because Wall 4 was Inland's work. So the your work exclusion would apply to Wall 4, just standing on its own. Otherwise... I guess I'm confused, because first of all, it seemed to me that there wasn't a whole lot of, maybe even a concession, that the exclusion applied and the issue was the exception to the exclusion. But on the question of whether the exclusion applies, it covers impaired property that has not been physically injured arising out of a defect, deficiency in your product or your work. So whether it's the wall or the grating, why isn't this your work? So the defect was the grating. Other property was damaged. So Inland did work on top of the lot. They moved dirt from one location and placed it on top of these retaining walls that sat above, I'm sorry, on top of the lots that sat above the retaining walls. Everything below that is not Inland's work. You had a pre-existing parcel that Inland added something to. The dirt that they brought in and grated and shaped, that's their work, that top layer of soil, which was done improperly and done in a way that caused water to pond and then drained down and damaged the So you don't get to impaired property because we're not talking about Inland's work. You have damaged property that is not Inland's work. Okay. Wait a minute. So now you're not getting to the – I understood your briefing the way Judge Brass understood your briefing. So now today you're telling us you don't get to the exclusion, much less the exception to the exclusion. Is that right? That's correct, Your Honor. Okay. So this is a big shift for me. But so just run this by me again. Now you're back to – this, I think, is in response to my question about was the district court wrong to assume coverage and then move on. So now you're back to talking just about coverage. And just run this by me one more time. So Inland, I appreciate that they built the retaining wall. I did not understand the argument in the briefing about why it would help you that they grated and that there was ponding up ahead. Because it seemed to me your client did the grating. I think Judge Brass is just asking the same point. So could you run that by us one more time? This seems to be quite different than what I understood from the briefs. And I'm sorry, Your Honor. I represent Union Ridge Ranch, the property owner. Mr. Bragg represents Inland. Oh, sorry. Yeah. Either way, somebody's got to tell me about this ponding, because I don't understand how this changes anything. So there's extensive evidence in the record from the geotechnical engineer, the various experts hired by the parties, where they analyzed why the wall failed. And their analysis was that the top layer of soil, so let me just back up. Inland was a site infrastructure contractor. They were hired to come in and do grating, walls, underground infrastructure. So we understand that. You have very little time. So we understand that. But didn't Inland do the contouring as well as the constructing of the wall? They did the contouring. The contouring was defective. The contouring, the grating on top, is Inland's work. So that's a defect in Inland's work, but it caused property damage, physical injury to the property. Under Washington law, under the definition of property damage, this saturation of the soils below Inland's work, the existing lot, that's property damage. If you look at the Washington definitions of what counts as property damage in our briefing, the saturation of those soils is damage to property other than Inland's work, which in turn caused the failure of Wall 4, which was Inland's work. And then we'd have to start talking about the impaired property exclusion. Let's just assume you have coverage in the first instance. We get to the exclusion. The exclusion talks about property damage to impaired property. Was property damaged? Yes. Okay, was property impaired? Property was impaired, yes. Yeah, okay. I'm with you. So then it goes on to say property damage to impaired property arising out of. Why would we say that property damage or impaired property that was harmed by this defective grading slash wall, why didn't that arise out of Inland's work on the grading slash wall? Because the saturated lot is not impaired property. Why not? It's property that suffered a tangible physical injury. Under the Seattle Partners case and the whole line of Washington cases that talk about what is physical injury to tangible property. The argument is that the physical injury to the tangible property is what happened behind the retaining wall? That's correct, Your Honor, to the portion of the property that was not Inland's work. The saturated soils? Yes. Okay. So what happened to the. . . What are we fighting over here then? We're fighting over some other property that was downstream essentially? Yes. If we've got a covered peril, so damaged property that was not Inland's work in the form of the lot, saturated soils, then you ignore the exclusion for all of the other events in the chain. Isn't the reason the property was damaged because of Inland's work? Isn't that what led to all this? But that's always going to be the case under commercial general liability policy. It covers property damage arising from the insured's negligence. See, Inland was negligent in doing their work, which caused damage to property that was not their work. The impaired property exclusion only kicks in when a defect in the insured's work causes damage to property that is not physically injured, but the lot underneath Inland's work was physically injured. Excuse me. So which part of the property was not physically injured? All of the lots that could not be sold because of the condition of Wall 4. All right. So that's going to lead to another problem, which is I can't tell on this record exactly why the three sales fell through. So, Your Honor, the first sale, there is no evidence in the record as to why the first sale fell through. There's an allegation in the complaint that the first buyer got this geotechnical report from Terra Pacific. Now you're talking about the complaint in the superior court, or you're talking about the complaint in the declaratory relief action? The superior court complaint. Okay. Well, that's got a different problem. What about the second? Because nobody's invoking judicial estoppel here. So what about the second and third sales? Second and third sales, there's evidence in the record that the property couldn't be sold to D.R. Horton, the second buyer, because the Wall 4 had failed during the time they were having these initial discussions. So they had to back off due to the failure of Wall 4. What about the third sale? Third sale was to Richmond Homes. And the evidence in the record shows that Richmond Homes declined to purchase the property because of the failure of Wall 4. What do we do with the district court saying that Inland concedes the property falls within the definition of impaired property? I don't think you have to do anything with it, Your Honor, because it does. The project as a whole would be impaired property because it wasn't physically harmed other than the lots above and below Wall 4. So you've got a handful of lots that are something beyond impaired property, because you've got testimony in the record from the project geotechnical engineer that said that those lots were rendered unbuildable, not able to be used for their intended purpose as soon as that wall failed. But for the project as a whole, it would ordinarily fall or meet the definition of impaired property. Because it was property that — That's why we're understanding. That's why the district court understood that, I think, that the issue was going to be the exclusion and the exception to the exclusion. And that's why I really wish the district court would have allowed oral argument on this, because I think we could have cleared it up. I must say it's not necessarily clearing it up for me. So I'm still unsure why you think the exclusion doesn't apply, whether it's because of the — it wasn't the property that Inland was actually working on. Is that the distinction you're trying to draw, to say, look, the wall itself was not the issue? Well, the wall certainly was the issue. Right. Right. But what caused the failure of the wall was not subject to any exclusion. It was damage to property that was not Inland's work. But, again, if Inland did the grading, why is it not Inland's work? That top layer is Inland's work, the soil they brought in. They damaged property that was not their work. So — So you contend that this pond essentially formed through natural causes having nothing to do with Inland, and that is why this ultimately failed? No. The ponding formed on top of the lot due to Inland's negligent grading. Behind the wall, right? Behind the wall. Okay. It leaked down below that top layer of grading that Inland installed, their work, and damaged the lot below. And the wall. Eventually the wall, because those soils became so heavy that they pushed the wall out. And how does this not arise out of Inland's work? It certainly arises out of Inland's work, but that's not what the impaired property exclusion talks about, because every instance of property damage covered under the policy is going to arise out of the insured's work somewhere. The issue is they damaged property that was not their work, as defined in the your work exclusion. Can you give me a record site for the reason that the third sale fell through? Oh. Or tell me where to look for it. I will when I come back and rebuttal.  That would be helpful to me. How am I doing on time? Can you see that you have five and a half minutes? I think he's actually five and a half over time. Actually, you are five and a half over time. That's how I read it. I should have put my glasses back on. Sorry. It's true. We've taken you way over, but Judge Van Dyke hasn't had a chance to even get a word in as wise. I'm okay for now. Thank you. I would just encourage Your Honors to carefully review the way that we've been doing. Counsel, we've carefully reviewed it, and you are now almost six minutes over time. Understood, Your Honor. Thank you so much. Thank you. Counsel, you can plan on one minute for rebuttal when you come back. Thank you, Your Honor. You bet. Can I just ask for clarification? So are we hearing from — I thought you all were splitting time on the appellant's side, but — I think we got an email yesterday that that was not going to happen. Oh, that's not true. Is that right? Okay. You've used all of your time and then some. When you come back, we'll give you a minute. But the time is — Madam Clerk, did you split the time on the clock for them? Yeah, they still requested split time. Oh, you did? Sorry. You have to wait a minute. Come right on up to the podium, please. Good morning. I'm Doug Bragg for Inland, and my plan was to save most of my time for rebuttal, but I did want to get back to the impaired property exclusion since I think that if the Court wants to consider that question of whether or not and how it applies, I think that the analysis — How would we not consider that question? Based upon Mr. Vial's argument a minute ago that if it doesn't apply under Washington law, then that would be one issue. The second issue is if you decide that it does still apply under Washington law, then how should the trial court have dealt with it? And I'd just like to address that briefly, if I may. So the impaired property exclusion has as an exception to it that it doesn't apply to the loss of use of other property that arises out of sudden and accidental physical injury to your product. And in this particular instance, there was no evidence before the Court that the The Washington Supreme Court has defined in — So your contention is that it was sudden and accidental? My contention is that the sudden and accidental definition is unexpected and unintentional as far as the damage is concerned. But the wall failed. Your client had at least — at least the record shows that there was at least one of these reports before the wall failed was delivered to your client. No, that's not in the record, Your Honor, respectfully. There is an allegation in the answer that was filed by Union Ridge Ranch that specifies that there was this terra firma report, and it's paragraph 93 of the answer, if I recall correctly. Let me do it this way. When is the first time your client hadn't noticed that there was a problem pre-breach? In order for this to be sudden and accidental within the meaning of Washington law, it has to have been unexpected to Inland, from Inland's point of view. And my concern is that there's a lot of record sites here, some of which were prepared way after the fact from geotechnical experts. But my understanding is that there had been a huddle at the site between Inland and Union Ridge where there was concern about the way the wall had been built before that wall failed. Is that wrong? That is not correct, Your Honor. It was when they discovered the bulging and cracking. They gathered in January, and that's when they discovered it. That's when Mr. Stalder was invited to it and saw it and said, oh, my God, there's a crack in the wall. That was — But this finding in the district court's order, you think this is incorrect? I do, Your Honor, because that's basically the only reference to terra firma, to that report, that November 2018 report, is in that allegation of the answer. That terra firma report is nowhere in the record, Your Honor. Well, it doesn't need to be in the record. I just need to know what happened. I need to know whether there's — whether the district court had a fact that wasn't disputed that put Inland on notice of the problem.  There was no evidence relating to the terra firma report at all. BITCO's entire approach was to rely solely upon the allegations. Counsel, I'm not — I'm not — we'll get to the evidentiary problem in a minute. Certainly. Okay? And I appreciate that BITCO didn't have evidence, and I think I've already said in response to one of the earlier representations that we're not relying on judicial estoppel vis-à-vis the superior court action. I think that's well taken. But there is a statement here to the effect that there was a huddle, that's my word, prior to the failure of the wall. And since we're looking at whether this was unexpected from Inland's perspective, at least on my scorecard, that's kind of the whole ballgame here. So what's your best shot, please? My best shot is that that took place — that was when they discovered the damage on her. That was when they discovered the bulging. That was the discovery. So you had no notice prior to that? None. All right. Okay. Go ahead. I would like to reserve the rest of my time for rebuttal, if that's right. That's fine. I think we better hear from BITCO, because this changes things pretty considerably. Come right on up, please. Good morning. May it please the Court, I'm John Hussman, arguing on behalf of BITCO General Insurance Corporation. The district court correctly held that the impaired property exclusion in the BITCO liability policy barred coverage for the underlying lawsuit because the appellants failed to meet their burden of demonstrating that the sole exception to the impaired property exclusion for sudden and accidental injury to the insured's work applied. So why don't you start with the exclusion itself, because now there's a contention that actually it doesn't apply in the first place. So why don't you walk us through your position on that? That it applies at all? Yeah. Yeah. Your Honor, happy to do that. The impaired property exclusion applies here, and it's important to keep in mind what we're talking about. What they're trying to recover for is the unrealized profit that they didn't get because they couldn't sell the project for as much as they wanted to sell it for. They are not more of the same. As I understand their argument, let me see if I can simplify this. As I understand their argument, there was defective work, right? Right. And that was stuff that was on top of stuff that was not their work, so it would be like a wall that they built falling over onto something that was not their work and hurting that. That's their argument, it appears to me. That appears to be their argument now. And then that stuff that was not their work fell over and hurt the retaining wall, right? So it's kind of a weird deal where they've got sandwiched in between their work, they've got stuff that's not their work. And they're saying that stuff in the middle that's not their work was damaged, physically damaged, so that falls within property damage. That falls within, so that's why they're saying they get out of the impaired work exclusion because they're saying that we just caused property. Now, but it seems like it's still all of that, that whole chain of events, is what actually ended up impairing the property. So I'm trying to follow the logic here. Well, I don't think there is logic there, frankly. Well, basically their argument seems to me that as long as there's some property that's not theirs that is part of the cascade of bad things happening, then that gets them out of the incident. Explain why that's not true.  First of all, that's not what they're trying to recover for. They're not alleging that little slice of property. They're not saying we had to pay this much money to regrade, we had to pay this much money to drain these soils, none of that, or even rebuild the wall. They're saying our project never got to the value it should have gotten had Inland done its work right. Inland did not deliver on their contractual obligations what they were supposed to. That's not what liability insurance is there for. We are not a guarantee of performance of builders. I understand that, but it seems like they're saying at least here now that part of the reason that happened, that we weren't able to get the amount of money we wanted, that our project was impaired, part of the reason is because this slice, because it broke, because it broke part of the property that was already there by saturating something they didn't work on, because they pooled water on top and they put a bad grading on top. So it broke that, and what you're saying is yes, but that specific damage is a tiny amount of what they're asking for, in theory. It's actually none of what they're asking for, but here's the problem. So the impaired property is the whole parcel, the whole project. They've admitted that, and the exclusion says the policy does not apply to impaired property arising out of a defect deficiency inadequacy in your work, Inland's work, or a delay. So whether it's ponding, whether it's walls cracking and falling down, whether it's the soils beneath becoming saturated, I'm not sure that's even property damage, but they're going to get wet anyway. It arises out of, and this is throughout the record and being admitted, it arises out of Inland's faulty grading work. Everything does. So the impaired property, that is the whole project, they say, wait, couldn't sell this whole project. And why? Because Inland didn't deliver proper grading work. That's exactly false. It travels through work that's not their work, so to speak. There's a retaining wall on one side and there's their work on top, but their argument is that there's damage to property that was not their work in the middle. Your argument would be that that all still falls within the arising out of, because traveling through there, it still arises out of, and that the property as a whole is what they're, the damage to the property as a whole, the impairment to the property as a whole is what they're asking for. It's not just that. It would be different, I suppose, if they were just asking for the damage to that little piece. Right. You can imagine a situation where a grading work happens. Something they build falls over and it breaks something they did not build. Right. And they're only asking for the damages to the breaking of the thing they didn't build. But then if they go and they're asking for damages because they can't sell a whole property, then you'd say it arises out of and it falls with them. Yeah, and the reason is why couldn't they sell the whole property? Because it incorporated their work. That's directly within the impaired property exclusion. So what is the policy then? If it doesn't cover this, what does it cover? It covers property damage and bodily injury caused by an occurrence, so an accident that happens on site. You know, bodily injury, it's easy to understand. The guy falls down, falls off the scaffolding, whatever. Property damage, it could be, as Judge Van Dyke mentioned, you could have landscaping work that fails and a mudslide comes down and wipes out a home. The landscaper never touched the home. Right? Somebody else built the home, different part of the project. That could conceivably be covered. Now, there's a number of other exclusions. I can't, you know, you'd have to know exactly what the situation was to know whether it applied or not. But you're saying what it excludes is basically negligent work by the builder? It does. It does. It does that through a number of exclusions called the business risk exclusions. And the philosophy there is we don't, we're not your surety. We're not here to guarantee that you do your work right. It would be a moral hazard otherwise because anyone could just take any contract, build any way they liked, as negligently as they pleased, and then just turn to their liability carrier. Can I go back to your example of the home? So it would cover the home, the mudslide wipes out, it would cover the home. But if it turned out that you couldn't, now that was the only home on the screen. But now you can't sell the whole project as a whole. Your argument would be that's not covered because what's happened is the fact that there's a mudslide scared away all the buyers. And so it's impaired. You've impaired a whole bunch of property that more than just the home that was wiped out. You've impaired the whole project. And so that would not be covered is your argument. If it came outside the exception and no other exclusion possibly. But the inability to sell the whole project isn't property damage caused by an accident. That's disappointed commercial expectations. So now you're relying on a causation theory. No, no. Because Judge Van Dyke is talking about a different part of the policy. Yeah. Judge Van Dyke is talking about whether it would be property damage if some work. If the mudslide in this example took out the home. Took out a home, yeah. That's not what we have here. Because that's her argument is that it didn't take out a home, but it took out a piece of property that was not their property in sort of in the middle. But your point, I think, in response to that is, as I understand it, is they're not just asking for damages. In fact, they're not really asking for damages for that piece of property that was not worked on. They're asking for the fact that this project couldn't be sold. So it would be akin to some accident happening. It wipes out a home, scares away all the buyers for an entire subdivision project or something. Yeah. I mean, you can tell it from the allegations that were made in the state court suit. I mean, it is. They never even. They never talk about soil. They never talk about walls. They don't. None of this is mentioned. It's inland didn't perform its work right. The geotechnical people came out and saw that, and the buyers were scared off. Can I? You just got to the place I want to get to, which is when did this first become available? I appreciate you're talking now, I think, and we have it for the last several minutes, about whether the exclusion applies at all. But I'm interested in the exception to the exclusion. Okay. And the district court thought that in November of 2018, two months before the failure, the inland was put on notice of the problems with the work. Is that right? I think the district court, I don't know that they said specifically what inland knew or didn't know. I'm not sure that that's in the record, but I think what is. Well, it needs to be, because this is under Washington law, unless I'm really understanding Washington law. But sudden and accidental under Washington law, we're going to view from the perspective of the insured of inland, and we're looking to see whether this was accidental, excuse me, unexpected from inland's perspective. And the district court thought at ER 19 that it wasn't, that a geotechnical report had been made available. I'm a little concerned because I'm not sure I'd have to check these record sites, but it may be that some of them are coming from the answer of the counterclaims in state court. Nobody's argued judicial estoppel. So I'm just trying to figure out if there was evidence in the record, you know, in this declaratory relief action that the district court could have relied on. It may be that he did. I just don't know what this docket entry is, to show that inland was on notice of problems with the work before the wall failed. Yeah. So the district court looked at, you know, what they had in front of them and found that the failure, the problems with the wall were inevitable based on the reports previously. Well, but that's after the fact. I appreciate that. Many of those reports were after the fact. There are several geotech reports. That's why I'm asking a really specific question, because under Washington law, I think the failure, which I'm assuming everybody seems to agree that the failure is when the wall bulges or cracks. And so understanding that, I'm looking for whether or not anything in the record shows that inland was on notice before the wall cracked, before it failed, that there was problems with the work. Well, I mean, they performed the work. I don't know whether or not they received. I don't know that it's in the record whether or not they received the technical report before or after the buyers pulled out. We know that. I'm not asking about before the buyers pulled out. If I did, I misspoke. I'm asking about did they know there was a problem prior, with their work, any of their grading or any of their work at all prior to the time the wall failed? I don't know that that's in the record. I don't know that that notice is in the record. All right. But the reason that is, that isn't dispositive because the wall is not what caused this loss of use.  So now we're talking about the efficient proximate cause rule. So you think that what caused the loss of use was what, sir? The negligent work. The faulty workmanship caused it. Let me be clear. The efficient proximate cause doctrine does not apply here. I didn't mean to waylay you. I'm just trying to get to the other prong of the argument. The other prong of the argument is the one you're about to, I think, launch into, and that would be helpful. Okay. About? I don't know where you think I'm going. My question is about the wall, that the failure of the wall is not what caused it. Oh, yes. Right. The wall is not what caused the sales to not happen. What caused it was it was riddled with bad work. So I asked opposing counsel a minute ago, can we nail down why the third buyer backed out? I don't know that that's in the record either. But the fact of the matter is once buyer one was gone, the damage was in place. But why is that? Because buyer two showed up. There was a second buyer. But the property was in the same condition it was when buyer one was there. And if the sale had closed, we wouldn't be here, right? Right. I guess if they had managed to sell it for what they wanted to sell it for, they wouldn't have made a claim. But, yeah, once buyer one was gone, the project didn't get better. If anything, it got a little worse as time went by. So the damage, and I use that word in quotes because I don't believe there is property damage to the entire project, but their inability to sell it was locked in from buyer one. The problems and defects in the project were there when buyer two came along and when buyer three came along. They all didn't buy it because— On the sudden and accidental point, I mean this is now getting into the question of why people didn't buy, and you have an argument under that. But just the district court first went on the ground that it was not sudden and accidental because this is what the district court said. Every expert analysis of the walls, both before and after Walls 4's failure, concluded that all the retaining walls were likely to fail. And then the district court walked through reports from November 2018, February 2019, June 2019, that all the retaining walls were poorly constructed and likely to fail. So it seems — was the district court's reliance on that evidence improper?  No, not at all. The — it is — it's showing why they — that this doesn't fit within the sudden and accidental pollution. But sudden and accidental is a really specific term of art. And we — as you know well, given what you do for a living. And so Washington defines that a particular way, and it's quite counterintuitive. I've always found this exclusion to be — or exception to be quite counterintuitive. Because it implies in cases where there's a leaking underground storage tank or something that has taken a long time to corrode. So it's not sudden in that sense. Right. Hence Washington's definition, which is unexpected from the perspective of the insurer. So even something — as I understand it, sir, please correct me if I'm wrong. But I think under Washington law, even if something takes a really long time to corrode, the question we're looking at is whether the actual breach is unexpected from the insurer's perspective. Do I have that wrong? You're correct in the — in the pollution context. Okay. Because that phrase — So how does this differ? Because this isn't the pollution context. This is construction. And it's sudden and accidental, not release, escape, blah, blah, blah, pollutants. It's sudden and accidental injury to the insured's work. Well, that's what the other team is arguing, that there was a sudden and accidental release when the wall broke. Right. And to — and we know — So in other words, going into this, the notion that it was not sudden and accidental using a sort of a dictionary definition would get us to a very different result. Right. There's no Washington law on the impaired property exception. There is in the pollution exclusion, an old version of the pollution exclusion. And we know that that case law —  It's ubiquitous. That exclusion is used — it has a very specific meaning. So where do we look to say that when we're looking at property damage of this sort, that we should give it a different interpretation? Because — okay. Because the canons of construction of policy interpretation would say you have to give every word meaning. You can't make words redundant or meaningless. And if you take the temporal element out of the word sudden, you have basically rendered it meaningless. Well, no. That's how it's routinely construed, as you said, in the pollution context. What I'm asking for now is what do we look to to decide that you're right when you urge us to give it an entirely different meaning in this context? Well, like I said, I think the — I understand that, yes, there is a body of case law on using the same words in a different policy provision. I don't know that that is binding on this case. However, again, even if — even if we're going to just say that it just means unexpected, there is plenty of evidence that the — as the work went on and that it was expected, it was inevitable, as the district court said. One, and the — again, it's — the wall is not the problem. If we use the dictionary definition of sudden and accidental, then your argument about this being an inevitable consequence makes sense to me. But if the district court should have applied — and I don't know this, I'm asking this — should have applied the customary interpretation of sudden and accidental that we use in other cases, then the question really is whether it was unexpected from the insured standpoint. That's what I'm trying to get at. It sounds like you don't have a place to point me to. Well, the district court — the district court's reasoning really fits both. I mean, because they said that the wall's failure was, like I say, inevitable, that they — it was clear from the outset. Everyone — the people that went out there and looked at it, the experts, expected more walls to fail. Right. So that would be the dictionary definition. Oh, that's just unexpected, right? That's just — or no. I mean, if it just means unexpected, then it wasn't. If it means abrupt and unexpected, it wasn't. And it's the appellant's burden to prove that. And what the district court found is they didn't. They didn't have evidence to show that it was either abrupt or unexpected. Yeah, I mean, I read the district court to be — the findings to line up with saying it was not unexpected. Everybody knew this was a possibility. The question, then, is what is the evidence that would support that finding? And is it the reports from the fall of 2018 and the winter of 2019, or is it something else? I think — yeah, I think it's the expert reports prior to that. And, yeah, and the fact that, again, the wall is — it was the faulty workmanship that scared the buyers off, not — Sir, can I ask you about when you — can you just flesh out your answer to Judge Bress's question a bit? You said that the reports say that this was inevitable and not unexpected. Did they say sort of as of what time it would have been apparent to everybody? I don't think they — I don't know that they say that or don't say that. I think they meant at the moment, at the time of inspection, and that is as early as, I believe, November 2018, you know, when the first round of buyers came through. I thought the whole timeline was that in the fall of 2018, there were all kinds of discussions about how this work was not, you know, up to snuff. I think that's — I think there was plenty of that. Wait a minute. I asked that question about five minutes ago, and you said you didn't think that was — Well, I don't know when or we didn't receive notice of the cracking in the wall. No, no. I asked a different question. Oh, sorry. So just to be clear, this is an important point. What are the meetings you're talking about now that would have put Inland on notice that work was defective prior to the time that the wall failed? I don't know the times and dates of those meetings. I mean, it's either in the pleadings or it's in the summary judgment briefing. In the state court? The state court pleadings? No, in the summary judgment briefing in the federal court.  That the court relied on. I see my time's up. I've taken a lot of your time. Judge Van Dyck, Judge Briss, thank you for your argument. Thank you. Your Honor, before I launch in here, you asked for where we could find evidence of why the second two buyers didn't purchase the project. That starts on page 49 of the opening brief, beginning with J2, the expert, opining that the improper installation of this wall, referring to Wall 4, ultimately led prospective purchasers losing profits. I take it nobody deposed these prospective purchasers. We don't have that? No, they did. That evidence wasn't before the district court. Exactly. And then on the following page, page 50, we have testimony from several witnesses as to why these prospective purchasers declined to purchase. And they declined to purchase or, in the case of Richmond Homes, demanded a $500,000 concession because of the failure of Wall 4. That's the evidence that was before the district court. And do we have something for the third purchaser as well? Or the first purchaser, rather. I'm asking about the last one, sir, the third. The third one was Richmond Homes. They demanded the $500,000 concession. The second was D.R. Horton. And so they didn't purchase it because they didn't get the $500,000 concession, or? Correct, because at that point the project was already under water. Okay. They couldn't have sold it. Thank you. The second purchaser was D.R. Horton. And counsel said the walls were in the same condition throughout. That's not true. Wall Number 4 failed after the first purchaser walked before the — before D.R. Horton came into the picture here. So the walls were not in the same condition. Wall Number 4 was still standing. As far as the evidence in the record, there's no evidence in the record at all that Inland was ever advised by anybody that the — that their work was defective, walls were likely to fail, any of that. The only evidence relied on by the district court is the allegations in the pleading in the Superior Court case. That's it.  Well, setting aside, because we're not going to employ judicial estoppel, no one's argued for that, and I don't know how it would apply here. What about the fact that there's some other reports dated, you know, post-dated after the wall failed that seem to suggest, although I don't have them here, I'm not sure that we have them in the record, but seem to suggest that the failure of the wall was inevitable from the beginning. Is it your contention that even though that may have been correct, that Inland didn't know about it? Exactly, Your Honor. Soil and Water Technologies, the geotechnical engineer, they inspected the wall construction on a regular basis. They wrote daily field reports. And at the end of the wall construction, they issued a letter that said the walls were built to code. So Inland received these reports. They would have had no basis for knowing that the walls were likely to fail in terms of the evidence that's in the record, not speculation or statements and pleadings or the district court counterclaims. The district court distinguished this case, Walla Walla, that talks about a leaking – it's this line of cases that I was referring to earlier where the sudden and accidental exclusion is – or exception is applied. And as I've indicated, I think it's applied broadly. It's in the thousands of insurance policies. So opposing counsel says that we should not apply that line of cases here because those are specific to insurance pollution cases. Do you have any legal authorities for us that would suggest that we should apply a common sense notion of sudden and accidental? Well, actually, Your Honor, I've got the Queen Anne case, which is the Washington case, that looks at other Washington cases. It talks about the term sudden being ambiguous. So without any reference to pollution or anything else, the term sudden in the sudden and accidental exception is ambiguous. They came up with a definition. There's no other case in Washington that defines it any other way. Are the cases that are cited in the brief all pollution cases? I believe the cases that are quoted are all pollution cases. There are sites to other cases that incorporate the same logic, or at least there are in the internal sites of the Queen Anne case. Okay. But getting to Queen Anne briefly, Your Honor, in terms of the insured's knowledge, there's no evidence that Inland knew the wall was going to fail before it failed. However, even if there was, it wouldn't have mattered, because when you look at the standard applied in the Queen Anne case, the insured's knowledge matters when the insured does their work, not at some point in the future before the bad thing happens. So if Inland built the wall, and while they were building the wall, they knew they were building the wall wrong, and that the inevitable consequence of that would be that the wall was going to fail, then it's not sudden. It's expected. I mean, I thought there was evidence in the record from October 2018 and November 2018 talking about some indications that walls were failing. Is that not correct? That's not correct. There are allegations in the superior court complaint that the district court relied on in reaching those conclusions, but there's no evidence in the record whatsoever that any of that happened. What about the wall having been put into use? The district court thought that, like, wing walls or something hadn't been constructed yet. Your briefs, or at least your team's briefs, indicate that the wall had been put into use. Was the construction complete? The construction on the wall that failed was complete. The evidence in the record, the deposition testimony from Seth Chandley, the geotechnical engineer, is clear on that. The wall is complete. It stood for several months. They had no reason to know that it was going to go wrong. What about the wing walls? What are the wing walls? I'm envisioning two walls that would have adjoined the wall you're talking about. Had those been constructed? I believe so, but I don't think that they were at issue here. I know the wall that actually failed was completely finished, and no more work had been performed on it for several months before it failed. Was any more work contemplated to be performed upon it? I don't know. No, no more work was contemplated to be performed, at least not until it failed, and then you had these long, drawn-out attempts at repair that didn't work. Okay, I've got my glasses on this time, and now I can tell that you're over your time, so I'll ask you to please wrap up. I think your co-counsel has a little time left. Thank you, Your Honor. Thank you. All right. Your Honor, I wanted to go back to responding on the question of what was in the record with regards to the sudden and accidental, and was there notice to Inland. And so the first thing is ER-7172 is a deposition of Seth Chanley. That's in the record. And he talks about that all the walls were okay except for the east half of wall number 4, which in the winter is when they discovered that it failed. And his comment was that unbelievably biased to see what occurred, what had happened. It was shocking to him, and he was with Soil and Water Technology. He was the one that was out there inspecting this as it went up. There was Joel Stalder, the property owner, and his deposition, which is at ER-204, he says the question was how did you discover there were issues with the retaining wall? And his response was, I think I saw Tim and a bunch of guys standing around looking at it, and I walked over there, and I'm like, what's going on? And he was like, well, these blocks are cracking right here. And I looked, and there's, yeah, there's multiple blocks that had cracked right in half because it was bulging. And that was what date? That was, he said that you first discovered the issues in late December, early January, question mark, answer, I believe that's correct. And the wall failed January 17th? Yes. So his recollection at the time. The J-2 report, which is ER-503, it's before that, but their conclusions at 503, it talks about it was clear that SWT Soil and Water Technologies was concerned with contractor performance during the entire time of the construction, but it also seemed apparent that SWT was not confident that the retaining wall number four was properly reconstructed. But ultimately, SWT decided the poor contractor performance did not preclude Inland from meeting code minimum standards, and they provided final report approving of the wall construction based on what the contractor told them was constructed instead of additional observations that they requested. So even the J-2 report notes that leading up to January 17, all the reports from Soil and Water Tech, which was out there doing these inspections, was you're meeting at least code minimum standards. You're meeting those requirements. The only evidence that I can find in the record relating to that November report that the trial court relied so heavily upon is at ER-49, and that is the answer in affirmative defenses filed by Union Ridge. And paragraph 94. That is the what answer? I'm sorry. It's the Defendant Union Ridge Ranch LLC's answer affirmative defenses and counterclaims. Right. And paragraph 94 states that on or about November 5, 2018, Terra Associates, Inc., a geotechnical engineering consultant, performed geotechnical testing of plaintiff's work on the project. Terra Associates, Inc.'s report identified numerous defects and deficiencies of plaintiff's work, including but not limited to the retaining walls were not built correctly and in accordance with the approved design plans. There was a substantial risk of future wall failures and displacement, particularly during the wet winter season and other defects. The Terra Associates report is not attached to this pleading, and there's no reference in this pleading that that report was ever presented to anybody or reviewed by anybody. It was certainly not reviewed by Mr. Stalder, who testified that his first awareness that there was a problem was in January when they showed it to him. Why does the report have to have been attached if there's a representation in the party's pleading in this action, in the declaratory relief action? I think the question is, what did the report specifically say? And two, who had access to it? My question is a little different. I'm trying to figure out whether or not your contention is that the district court erred by relying on something that appeared, I think, fairly to him, to be uncontested. I think the court erred in relying on it to the extent that the court said that this document was given to plaintiffs, given to Inland, and that Inland would have had notice of the defect. Well, setting aside whether the document was given to them, right, it seems to me, depending on how one looks at this exception to the exclusion, that what the district court may have been relying upon it for is to show that this failure wasn't unexpected or a surprise to Inland, and that that wasn't contested, that this, because this is in a pleading, a representation filed in this declaratory relief action. Why would the judge have been wrong to think that that is an uncontested fact? Well, the only allegation is that there's a report generated on a particular date. Isn't it a statement made by Union Ridge here? It is a statement made by Union Ridge that this report was created on a particular date. Well, if you want to talk about the rules of evidence, we're going to talk about a party-opponent admission, whichever you want. I'm trying to figure out how is it you think the district court was wrong? I think that the district court was wrong because this statement here does not show that Inland had any notice of this report. That's not what the allegation is in the answer. The question isn't whether they had notice of the report, sir. I'm not trying to split hairs, but in fairness to the district court, I'm trying to figure out whether or not he was right to decide that this exception to the exclusion applied, and that question, your opposing counsel is shaking his head no, but your co-counsel is shaking his head no, but I fail to see why that would have been error for the district court. If, as I understand it, the sudden and accidental exclusion, exception to the exclusion we're talking about requires that Inland have notice ahead. Either Inland. I think that's right. Right. And that's what I've been asking. Now, we're wildly over time again, but what I've been asking is where is it, where is support for the contention that for the district court's understanding that the exception should have been analyzed this way, that it wasn't unexpected from Inland's perspective that that wall would have failed? So I guess what I'm trying to show with this is that this allegation does not include any statement that Inland was provided this report before January 17th. Okay. What was the rule of SWT? Who retained that firm? They were retained, I believe, by Sterling, the civil engineer on the job. Okay. Does Inland have knowledge of SWT's work? Yes. They were given copies of the reports, I believe, and identified that everything was going along. And it was a surprise to SWT that the wall was four feet too tall and that it had failed. That was the testimony from Mr. Chandler. Questions? And the only other, there was one other thing I wanted to point out. Quickly, please. Okay. So with regards to the pollution cases, the question was whether or not sudden and accidental comes out of any other cases. In Queen City, the basis for the decision there starts with a boiler and machinery policy, and that's where they start with their analysis, and then they go to other pollution cases. So it actually is a definition Washington had used since 1959 in lumber. Thank you. Your Honor, may I have 10 seconds? No. Time's up and way in excess. Thank you for your understanding. We really do need to enforce those rules, and I've been — I haven't done a very good job of that today. I gave you both lots and lots of time. It's an important case to the parties. We understand that. We're going to take good care with it, and we'll take it under advisement and stand in recess at this time. All rise.
judges: CHRISTEN, BRESS, VANDYKE